Kenneth Ray SPENCER, Appellant,

v.

Gaila Sue SPENCER, Appellee.

No. 49292.

Court of Appeals of Oklahoma, Division No. 2.

May 24, 1977.

Released for Publication by Order of Court of Appeals June 16, 1977.

Karl R. Gray, Gray & Gray, Oklahoma City, for appellant.

Don Frankenberg, Lindsay, for appellee.

BRIGHTMIRE, Presiding Judge.

In November 1975 Kenneth Spencer filed this lawsuit seeking dissolution of an 11-year marriage to Gaila Sue Spencer and concomitant relief with regard to jointly acquired property and custodial provisions for the couple's 10- and 7-year-old boys. Gaila Sue by cross-petition asked for a divorce, custody of the children, a "fair share" of the accumulated property, child support money, alimony, and attorney fees.

Three days before Christmas 1975 the case was tried and a divorce granted, but a decision on other matters was postponed until December 30. On the latter date, the trial judge ordered that: (1) custody of the children be vested in their father "during the week" for 10 months and in their mother three weekends a month during this period and two summer months and in the father three weekends a month during this time; (2) the father pay $125 a month to the mother for support of the children during the 10 months he has custody and $300 per month during the two months the mother has custody; (3) the father be awarded a partially built house, a 1973 pickup truck, and all the debts (totaling about $6,100); and (4) the mother be granted $7,500 "alimony in lieu of property" payable $200 per month.

The father appeals assailing the decree in two particulars: (1) the child support award because it requires him to pay the mother $125 a month during the 10 months general custody is confided in him and because the amount set for the two summer months is too high; and (2) the "alimony in lieu of property" award.

I

Spearheading his frontal assault on the child support award is the father's cogent argument that it must inure directly to the benefit of the children and may not be a thinly wrought facade for parent support—in this case alimony for the mother. Evidently the trial judge sought to lay a foundation for the $125 monthly award by referring to the mother's weekend visitation rights as custodial thereby authorizing the payment for six days of "custody."

While the so-called "split custody" device is commonly employed in this state to allow a couple's children to be under the control of one parent during school sessions and the other during the "summer months,"[1] we think it impractical, if not

---

1. While this type of custodial division has been sanctioned in Gilbert v. Gilbert, Okl., 460 P.2d 929 (1969) and Conrad v. Conrad, Okl., 443 P.2d 110 (1968) grave doubt exists as to wheth-

impossible, to attempt a division of legal custody on a daily, weekend or even a weekly basis. The term "custody" is one of art and carries various definitional nuances to accommodate a variety of contexts. In the area of domestic relations it has acquired a generally understood, though unarticulated, meaning with reference to care and control of children. Even in this restricted area the courts have found themselves struggling with efforts to devise a comprehensive definition. For instance, it has been said that "[c]ustody embraces the sum of parental rights with respect to the rearing of a child, including its care. It includes the right to the child's services and earnings . . . and the right to direct his activities and make decisions regarding his care and control, education, health, and religion." [2] *Burge v. City & County of San Francisco,* 41 Cal.2d 608, 262 P.2d 6 (1953). And it is distinguishable from the right of visitation usually granted the noncustodial parent in that visitation privileges do not carry with them the earlier mentioned rights inherent in the child custodial status. *McFadden v. McFadden,* 206 Or. 253, 292 P.2d 795 (1956). Periods of visitation up to 60 days' duration granted to a noncustodial parent have been held not to diminish the custodial parent's rights or disturb the per-

er it is in the child's best interest. It has been denounced as deplorable by at least one state high court. *McFadden v. McFadden,* 206 Or. 253, 292 P.2d 795 (1956). And scholars in the field of psychology and psychiatry have likewise criticized the "split custody" arrangement as often favoring the interest of a parent rather than that of the child. Dr. Graham B. Blaine, Jr., chief of psychiatry, Harvard University Health Services, expressed his views on the subject in an essay published in a book entitled *Explaining Divorce to Children* 80 (E. Grollman ed. 1969). In explaining that the arrangement "has many pitfalls," he said:

"In the first place, it is hard to feel at home in any house which is lived in only half the year. Roots that have to be pulled up so often, rarely sink in and spread out enough to provide any sense of security. Also, all too often children thus divided are used unintentionally as pawns in the complicated power struggle between divorced husband and wife. Each parent may try to outdo the other in currying favor with the children, and, worst of all, one parent may depreciate the other because of bitterness and antagonism held over from the days before the divorce. There are often complications about means and cost of transportation from one establishment to another, as well as bickering about just when is the most convenient time for each parent to have the children. In the end, the child is frequently left with the feeling that he is a victim of vindictiveness and is valued only for his ability to spy on one parent for the other. Finally, there is the financial pressure, for a child may come to feel that he is only a source of funds for mother and a troublesome expense for father."

In the same work at page 172 Dr. Wayne E. Oates, professor of psychology of religion and pastoral care at the Southern Baptist Theological Seminary in Louisville, Kentucky, denounces what he refers to as "the custody 'rat race' of part-time here and part-time there" with this thought-provoking observation:

"The longer-range realism points toward what both parents should face: *Divorce ordinarily means that the child will sooner or later lose touch with one or the other of his parents.* Therefore, if a clean-cut decision about which relationship will be lost were made a part of the divorce agreement at the outset, the long-range benefits to the child would be more secure. Probably in most instances this means that the father not only 'pays through the nose' financially for a divorce; he also pays similarly from an emotional point of view in giving up his children. But whether the sacrifice is to be made by the mother or the father, a clean-cut break made with as little sentimentality as possible in the long run contributes to the well-being of the child.

"When this cannot be effected, usually the arrangements of courts are week-end visiting, vacation visiting, summer visiting, half-time with one parent and half-time with the other, and so forth. At best, these tend to become less and less tenable with the passing of time. The child develops friendships with other children, gets a program of activities and a schedule of his or her own, and more and more the visits with parents become contrived and unnatural. The topics of conversation become less varied. Day-to-day fellowship with a child is a natural prerequisite to comfortable conversation. Similarly from the parent's side, he or she develops new interests, relationships, and schedules. Often promises are made that cannot be fulfilled." (italics his)

Perhaps the courts should take a second look at the efficacy of requiring such split living and give the kids a real break.

**2.** In Oklahoma the father is entitled to his minor child's "custody, services and earnings." 10 O.S.1975 Supp. § 5.

manency of their domicile established by their legal custodian. *Allen v. Allen,* 200 Or. 678, 268 P.2d 358 (1954).[3]

■ It is in this general sense, we think, that the word custody was used in the relevant statutes on the subject—10 O.S. 1975 Supp. §§ 4, 5, 21; 12 O.S.1974 Supp. § 1277; 12 O.S.1975 Supp. §§ 1277.1, 1278; and 12 O.S.1976 Supp. § 1277.2. The result is that the trial court vested legal custody in the father and granted the mother right of visitation during three weekends monthly and two summer months. There is no basis in the record for requiring the father to pay the mother $125 a month during the 10 months she is entitled to weekend visitation privileges. During the summer, however, the mother is entitled to money for support of the children if she takes advantage of her right to visit and care for them full time for two months.

We hold, therefore, that ordering the father to pay Gaila Sue Spencer money for the support of the couple's two children during the months they are living with their father was error.

## II

■ Appellant's next complaint—that the $300 a month awarded the mother for the two summer months the children are to live with her is excessive—is not shown to have merit. He "admits that the [mother] is entitled to child support during those two summer months" but contends the amount set "is against the clear weight of the evidence." This conclusion is all appellant offers on the subject and thus, by implication at least, he seems satisfied with leaving it up to the court to search the record in an effort to figure out what reasons might underly the conclusion. This we decline to do.

## III

■ Finally, appellant assails the award of "alimony in lieu of a division" of proper-

ty in the amount of $7,500 because it exceeds one-half of the net value of the jointly acquired estate which he estimates to be $11,000.

Our attention is called to the general criteria for achieving an equitable division of joint property restated in *Bouma v. Bouma,* Okl., 439 P.2d 198 (1968); and applied in *Hill v. Hill,* 197 Okl. 697, 174 P.2d 232 (1946) and *Tobin v. Tobin,* 89 Okl. 12, 213 P. 884 (1923). The court, according to *Tobin,* "not only has a right, but should take into consideration the efforts of the respective parties during their married lives." For example, continued the court, "[i]f . . the accumulations have been due to her economy, industry, frugality, and sturdy virtues . . . [while] the husband has not been frugal . . . industrious . . . sagacious, but, on the contrary, has spent much of his money in riotous living, in gambling, drinking, or associations truant to his marriage vows, it would not be equitable" to award the husband half the property. In *Hill* an award of half the property to each party was upheld because there was "no evidence of the absence of economy, industry or frugality on the part of either . . . ." Later in reviewing these beacon buoys of equity anchored in the murky waters of nuptial property division *Bouma* made these general observations: (1) need affords no criterion; and (2) "the extent of each party's rights in the property" depends on "their respective conduct and efforts as the contributing factors" in the creation and acquisition of the entire marital estate.

The evidence made material by these principles is that the father is a hard working, industrious man not only holding down a full-time job during the day, but ordinarily working around the house at other times either tending a good size garden, building a new house, or performing other valuable services. He is frugal, temperate and not given to riotous living or truant associations.

---

**3.** Although the jurisdictional rule followed in *Allen* was overruled in *Hawkins v. Hawkins,* 264 Or. 221, 504 P.2d 709 (1972), it does not appear that the domiciliary principle has been disturbed.

On the other hand the evidence disclosed that the mother is somewhat of an economic millstone hanging on appellant. Neighbors testified that she spent most of the day (until about 30 minutes before appellant was due home from work) loafing around the house with nothing on except a see-through "nightie"; that she neglected not only her household duties but the two young boys who were not "kept clean" and were not given proper meals (cookies before a frequent supper of "hot dogs" notwithstanding the deep freezer was full of vegetables grown by the father). There was evidence that instead of canning or using produce from appellant's garden "she would just let it lay in the icebox or just throw it out."

Appellee addresses neither the evidence bearing on the factors contributing to the accumulation of the joint estate, nor the relevant law. Instead she argues that the value placed on a partially completed house awarded to appellant is more than that figured by appellant so that instead of appellee's being awarded 68 percent of the joint assets, as appellant contends, she received only 41 percent.

Appellee's figure in our opinion is pretty close to the one supported by the evidence. The joint assets owned by the parties at the time of trial were: (1) a partially completed house; (2) household goods and appliances; and (3) a 1973 Chevrolet ½-ton pickup truck. The parties were in debt some $6,100. While the record is not too clear about the value of the pickup and the furnishings they appear to be worth at least $1,400. The evidence is somewhat better in regard to the 2,100 square foot house which plaintiff himself started building and which at time of trial was about 60 percent complete. One of appellant's witnesses placed a value of $36,700 on the house had it been completed. Based on the percentage of completion the structure was worth about $22,000. This figure added to the other two assets results in a gross estate value of $23,400. After $6,100 worth of liabilities is deducted from this, a net estate of $17,300 remains of which $7,500 is about 43 percent. Although under the evidence this percentage of the joint estate still seems high, we cannot say the trial court abused her discretion especially since it was, in effect, in lieu of alimony.

The decree entered in this case is modified by deleting the order directing appellant to pay appellee child support during the 10 months the children live with him, and in all other respects it is affirmed.

Affirmed as modified.

BACON and NEPTUNE, JJ., concur.